# Cole *v.* Birmingham Union Railway Co. *et als.*

*Bill in Equity by a Stockholder for Appointment of a Receiver and for an Accounting.*

1. *Corporations; stockholders; diligence required of.*—Stockholders, to be entitled to the summary interference of the court, in cases where they seek protection against acts which are merely in excess of the powers of the corporation, and are not prohibited by law, must be diligent. They must apply so recently after the doing of the act of which they complain that the court may stop or undo the wrong to them *without doing equal or greater wrong to some other person.*

2. *Same; same; ultra vires acts; laches.*—Stockholders cannot lie by, sanctioning, or by their silence at least acquiescing in, an

[Cole v. Birmingham Union Railway Co., *et als.*]

agreement which is *ultra vires* of the company to which they belong,. watching the result, if it be favorable or profitable to themselves, to abide by it and insist upon its validity; but, if it prove unfavorable and disastrous, then to institute proceedings to set it aside.

3. *Same; same; same; same.*—If a stockholder wants protection against the consequences of an *ultra vires* act, he must ask for it with sufficient promptness to enable the court to do justice to him without doing injustice to others.

4. *Laches; as distinguished from the statute of limitations.*—Laches is not, like limitation, a mere matter of time, but principally the question of inequity of permitting a claim to be enforced; and, when this inequity exists, a court of equity will refuse relief, although the time which has elapsed since the alleged injury is less than that which is made a bar by the statute of limitations.

5. *Same; as defense to suit; how pleaded.*—Laches alone is sufficient to bar equitable relief, and the doctrine is applied regardless of the statute of limitations and, frequently, where the period of time elapsed is comparatively short, and the defense may properly be raised by demurrer.

6. *Same; fraud newly discovered; as excuse for; how pleaded.*—In a bill to obtain relief from an alleged, but concealed and recently discovered, fraud, it was always held that there must be distinct averments as to the time of the discovery of the fraud, how the knowledge was obtained, why it was not obtained earlier, and as to the diligence previously used in the investigation of the fraudulent transaction, so that a court would discover from the bill itself whether the complainant had not lost his rights by his negligence.

7. *Fraud; means of knowledge; equivalent to notice.*—Whatever is sufficient to excite attention and put the party on his guard, and call for inquiry, is notice of everything to which the inquiry would lead. When a person has sufficient information to lead him to a fact, he will be deemed conversant with it.

8. *Same; laches; case at bar.*—Where the transaction complained of is the *ultra vires* consolidation made, or attempted to be made, of several corporations, by proceedings had and entered upon the books of the respective corporations, it is difficult to see upon what ground the transaction can be regarded as one which cancels itself. On the contrary, the court would be inclined to hold that the stockholders of the respective corporations are charged with notice of the proceedings and bound to proceed with reasonable diligence to annul them;

[Cole v. Birmingham Union Railway Co., *et' als.*]

and, however this may be, they cannot stand by for a series of years, making no sign of discontent, while other innocent parties invest their means upon the faith of the validity of the consolidation. Even if complainant is without actual notice of the consolidation of which he complains, he had notice of facts sufficient to put him on inquiry.

APPEAL from the Chancery Court of Jefferson.

Heard before the Hon. JOHN C. CARMICHAEL.

The bill in this case was filed by appellant, who avers himself to be the owner of seventy-five shares of the capital stock of the Birmingham Union Railway Company, and seeks to set aside a transfer of the assets of said corporation, alleged to have been made in 1891, to the Birmingham Railway & Electric Company. The bill further seeks to set aside another transfer of the assets of the corporation made by said Birmingham Railway & Electric Company in February, 1893, to the Birmingham Railway, Light & Power Company, an Alabama corporation. It is shown that, in each sale, the assets of the vendor corporation were paid for by issuing stock of the vendee corporation to the owners of stock of the vendor corporation. The complainant alleges that he did not assent to either of these transactions; that each of the sales was *ultra vires;* and as to him were and are void. The bill further alleges that complainant bought his stock in April, 1890, and that it is now of great value, and has earned large dividends since said sales. That under and by virtue of the several consolidations that were effected by the sales described in the bill, the several corporations, to-wit: the Birmingham Railway & Electric Company and the Birmingham Railway, Light & Power Company, have executed several series of bonds secured by mortgages on all the properties attempted to be consolidated by them, including the property of the Birmingham Union Railway Company; and that the property of the Birmingham Union Railway Company, included in said mortgage, is the most valuable portion of the property attempted to be mortgaged by the said Birmingham Railway & Electric Company, and by the said Birmingham Railway, Light & Power Company. The bill further alleges that the owners and purchasers

of the said bonds took the same with full knowledge of
the invalidity of the said certificates as far as the proper-
ty of the Birmingham Union Railway Company is con-
cerned.    The bill further avers that complainant is,
and at all times has been, a resident of the State of Ten-
nessee, and that he was not aware of the true condition
of matters until within the last few months.    It is fur-
ther stated that said Birmingham Union Railway Com-
pany has had no meeting of its stockholders since 1893.
The bill alleges further that the facts and circumstances
connected with the consolidation of said several compa-
nies are wholly within the knowledge of the parties who
have manipulated the same; that complainant has made
diligent efforts to ascertain the details of said transac-
tions, but has been unable to procure the books of the
company showing the same, if they are shown by said
books, or to elicit any information from said parties
having knowledge thereof.    A copy of the charter of the
Birmingham Union Railway Company, a copy of an act
of the legislature of Alabama, entitled "An Act to con-
firm, amend and enlarge the charter of the Birmingham
Railway & Electric Company, and to ratify and confirm
the consolidation of the Bessemer & Birmingham Rail-
road Company with other corporations therein named"
(Acts 1890-91, p. 584) ; and a copy of an act of the leg-
islature conferring additional powers on the Birming-
ham Railway & Electric Company (Acts 1892-93, p. 794),
were attached as exhibits to the bill.    The Birmingham
Union Railway Company, the Birmingham Railway &
Electric Company, the Birmingham Railway, Light &
Power Company, and the trust companies, acting as
trustees under said several mentioned mortgages, are
made parties defendant.    The bill prays for the appoint-
ment of a receiver to take charge of all the assets of the
Birmingham Union Railway Company, and that the Bir-
mingham Railway Light & Power Company be ordered to
surrender and transfer such assets to said receiver; and
that the mortgages executed since said alleged consolida-
tion be set aside and held for naught in so far as they
affect the rights and property of the Birmingham
Union Railway Company; and for an accounting by the

several defendants of the assets of the Birmingham Union Railway Company, which have come into their respective hands. The defendants demurred to the bill on the ground of the laches of the defendant. The demurrer was sustained, and the bill dismissed by the decree of the chancery court; and from this decree, the complainant appealed.

JOHN F. MARTIN and A. LATADY, for appellant.— Laches cannot be imputed to complainant under the averments of the bill. Absence from the State is a legitimate excuse.—*Hallett v. Collins,* 10 Harvard 187.

Then, too, there must have been knowledge on the part of complainant that some one other than the perpetrator of the wrong was relying on his silence;—*Williamson v. Jones,* 38 L. R. A. 70; *Ville v. Johnson,* 82 N. Y. 40.

Where a legal right is involved, and, upon ground of equity jurisdiction, the courts have been called on to sustain it, the mere laches of the party seeking relief, unaccompanied by circumstances which amount to an estoppel, constitute no defense;—*Galway v. R. R. Co.,* 128 N. Y. 132.

Laches is defined as inexcusable delay in ascertaining a right, and one who acts as soon as possible after learning of his rights, or after his rights have been involved, cannot be charged with delay;—*Byrne v. Schuyler,* 28 L. R. A. 310; *Hammond v. Hopkins,* 143 U. S. 274; *Hoyt v. Latham,* Ibid 553; *Halstead v. Grinnon,* 152 U. S. 410; 18 Am. & Eng. Cyc. of Law, 115; *None v. Chiles,* 10 Peters 178.

WALKER, TILLMAN, CAMPBELL & WALKER, *contra.*

(No brief came into the hands of the reporter.)

HARALSON, J.—The defense relied on is that, having delayed for more than ten years in seeking relief, allowing conditions to change, and the rights of third parties to intervene, defendant is barred, by his laches, of any relief prayed.

The question of laches, as applicable to this case, has been so often considered and approved by this and other

courts and law writers, as to leave nothing new to be originated on the question. It will suit our purposes as well, if not better, therefore, to refer to some of these authorities bearing directly on the case, and repeat the language employed in some of them found to be applicable. In the case of *Robb v. Dunlap*, 51 N. J. Eq., in point in many of its phases, it is said: "But stockholders, to be entitled to the summary interference of the court in cases where they seek protection against acts which are merely in excess of the powers of the corporation, and are not prohibited by law, must be diligent. They must apply so recently after the doing of the act of which they complain that the court may stop or undo the wrong to them *without doing equal or greater wrong to some other person.* The principle which must control the action of a court of equity in cases where the defense is laches, was laid down by Lord Camden many years ago in these words: 'Nothing can call forth the activity of a court of equity but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in equity.'—*Smith v. Clay*, reported in a note to *Delvraine v. Brown*, 3 Brown Ch. 639, 2 Amb. 645. This principle, as it is applied to stockholders who are tardy in seeking protection against acts *ultra vires* of the corporation, was expressed by Sir John Romilly, master of the rolls, in *Gregory v. Patchett*, 33 Beav. 595, 602, in this form; 'Shareholders cannot lie by, sanctioning, or by their silence at least acquiescing in, an arrangement which is *ultra vires* of the company to which they belong, watching the result—if it be favorable and profitable to themselves, to abide by it, and insist upon its validity; but, if it prove unfavorable and disastrous, then to institute proceedings to set it aside.' And Lord Justice TURNER'S statement of the rule is equally pertinent to the case in hand. In *Great Western Ry. Co. v. Oxford, W. & W. Ry. Co.*, 3 De Gex, M. & G. 341, 359, he said: 'Where the summary interference of this court is invoked in cases of this nature, it must be invoked promptly.

[Cole v. Birmingham Union Railway Co., *et als.*]

Parties who have lain by, and permitted a large expenditure to be made, in contravention of the rights for which they contend, cannot call upon the court for its summary interference. The jurisdiction to interfere is purely equitable, and it must be governed by equitable principles. One of the first of those principles is that parties coming into equity must do equity, and this principle more than reaches to cases of this description. If parties cannot come into equity without submitting to do equity, *a fortiori*, they cannot come for the summary interference of the court when their conduct before coming has been such as to prevent equity being done.' The cases in which this principle, as it is applied to stockholders, has been discussed are numerous. The doctrine they established is, that, where an act is done *openly*, and especially on notice, and without evil intent, though clearly in excess of the power of the corporation. a non-assenting stockholder will not be allowed to pause to speculate upon the chances—to wait until he can see whether such act is likely to result in profit or loss—but, to be entitled to the summary interference of the court, he must ask for it promptly, and before the act of which he complains has become the foundation of rights or equities which must be destroyed, or greatly impaired, if the act be nullified or undone. Or, stated with greater brevity and in its simple essence, the rule is this: If he wants protection against the consequences of an *ultra vires* act, he must ask for it with sufficient promptness to enable the court to do justice to him without doing injustice to others."

In *Hubbard v. Manhattan Trust Co.*, 87 Fed. Rep. 59, it was said: "It is averred in the most general terms that the hypothecation was fraudulently concealed from the complainants, and that they did not learn of the wrongs alleged until after the sale, and, in another part of the bill, until long after the sale of the bonds and stock. * * * * * * The defense of staleness is not the defense that a lapse of time has taken place since the cause of action accrued, which has created a bar analogous or akin to the bar created by the statute of

28s

limitations. 'Laches is not, like limitations, a mere matter of time, but principally a question of the inequity of permitting a claim to be enforced;' (*Galliher v. Caldwell*, 145 U. S. 368, 12 Sup. Ct. 873); and, when this inequity exists, a court of equity will refuse relief, although the time which has elapsed since the alleged injury is less than that which is made a bar by the statute of limitations; (*Alsop v. Riker*, 155 U. S. 448). This inequity often arises from the changed value of the property during the time which has elapsed since the date of the transactions which are the subject of the suit, or from the changed relation of the parties to the property, as when a sale has taken place, and new rights have arisen. This class of cases frequently appears in the latter volumes of reports of the Supreme Court, some of which are cited in *Galliher v. Caldwell, supra.* This case is not one of the class where the value of the property has risen greatly while the complainant slumbered, or where new rights have arisen. * * * * * In a bill to obtain relief from an alleged, but concealed and recently discovered, fraud, it was always held that there must be distinct averments as to the time of the discovery of the fraud, how the knowledge was obtained, why it was not obtained earlier, and as to the diligence previously used in the investigation of the fraudulent transaction, so that a court would discover from the bill itself whether the complainant had not lost his rights by his negligence.—*Stearns v. Page*, 7 How. 819. It therefore naturally resulted that 'A defense grounded upon the staleness of the claim asserted may be made by demurrer.'—*Lansdale v. Smith*, 106 U. S. 391."

"Laches alone is sufficient to bar equitable relief, especially when it has been so long continued as to render the relief sought doubtful, uncertain, unfair or unjust."
—*Ohio River R. Co. v. Johnson*, 40 S. E. Rep. 407.

In *Patterson v. Hewitt*, 66 Pac. Rep. 522, (s. c., 55 L. R. A. 658), one of the most elaborate and well considered cases to be found, a great array of authorities are cited and reviewed. Many cases are referred to, where the doctrine of laches was applied regardless of the statute of limitations, and where the period of time was compar-

atively short. "The court points out that in the cases of *Harwood v. Railroad Co.,* 17 Wallace, 79, and in *Davison v. Davis,* 125 U. S. 90, a delay of five years was held to be inexcusable laches."

In *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587, and *Hayward v. Eliot N. Bank,* 96 U. S. 611, four years was held to be laches.

In *Brown v. County of Buena Vista,* 95 U. S. 161, seven years was held to be laches, although the information of the complainants was secured but twenty months before the commencement of the suit.

In *Holgate v. Eaton,* 116 U. S. 33, and in *Societe Fonciere v. Milliken,* 135 U. S. 304, a delay of ten years in each case was held inexcusable laches.

In *Pollard v. Clayton,* 1 Kay & J. 462, (s. c., 13 Morrison Min. Rep. 334), a suit relating to mining property, eleven months was held to be fatal delay, etc. The doctrine is then stated, "When a case is of purely equitable cognizance, in the application of the doctrine of laches, courts of equity act upon their own inherent doctrines of discouraging, for the peace of society, antiquated demands, and refuse to interfere when there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights."

In Noyes on Intercorporate Relations, § 49, it is said, that "Laches in bringing suit will preclude a dissenting stockholder from enjoining a consolidation.    *    *    *    * Acquiescence for an extended period, during which time the interests of third parties have intervened, may itself constitute laches and prevent a stockholder from attacking a consolidation even on the ground of fraud."

As a general proposition, a party without notice or knowledge cannot be charged with laches. Means of knowledge, however, are equivalent to knowledge. As has been well said, "Means of knowledge, plainly within reach of stockholders by the exercise of the slightest diligence, is in legal effect equivalent to knowledge."— *Jesup v. Ill. C. R. Co.,* 43 Fed. Rep. 483. "Whatever is sufficient to excite attention, and put the party on his guard, and call for inquiry, is notice of every thing to which the inquiry would lead. When a person has suf-

ficient information to lead him to a fact, he will be deemed conversant with it. It is immaterial whether the court declares the consolidation void or voidable." —2 Cook on Corp. § 731, and note 1; *Adler v. Van Kirk Land Co.,* 114 Ala. 551; *James v. James,* 55 Ala. 525.

The case of *Leavenworth Co. v. Chicago R. R. Co.,* 18 Fed. Rep. 209, is in many respects identical with the one we consider on the question of notice. In the opinion it is said: " 'But while, as in the present case, the transaction complained of is the consolidation of two quasi-politic corporations, made or attempted to be made under and by virtue of authority conferred by a public statute, by proceedings had and entered of record upon the books of the respective corporations, * * * * * it is difficult to see upon what ground the transaction can be regarded as one which conceals itself. On the contrary, the court would be inclined to hold that the stockholders of the respective corporations are charged with notice of the proceedings, and bound to proceed with reasonable diligence to annul them. And, however this may be, they cannot stand by for a series of years, making no sign of discontent, while other innocent parties invest their means upon the faith of the validity of the consolidation.' Again the learned judge says: 'In the very nature of the case the consolidation of the two railroad companies in question must have been a transaction quite public and notorious in its character, and well known to the public, and especially to the stockholders in the respective corporations and others pecuniarily interested.' And again: 'It is said, however, that the complainant may have had notice of the fact of consolidation, but not of the facts rendering consolidation fraudulent. No doubt the question in all such cases must be, not whether complainant had knowledge of the act complained of, but whether he knew, or might, by proper diligence, have known, of the facts constituting the fraud. But what are the facts constituting the alleged fraud in the present case? The principle allegation is that the consolidation was fraudulent and void because the constituent corporations were without power to consolidate. Can the defendant be heard to plead its ignorance of the powers

of the corporation of which it was a member? We think it was bound to know what these powers were; and if it were not, it would be held bound, in such a case as this, to make inquiry within a reasonable time after the act complained of, and would be held to such knowledge as it might acquire by such inquiry. Whatever is sufficient to excite attention, and put the party on his guard and call for inquiry, is notice of everything to which the inquiry would have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant with it.—*Martin v. Smith,* 1 Dill, 96, and cases cited.' It is further said in the opinion in that case: 'The complainant knew, or should have known, that the corporation in which it was a stockholder had been consolidated with the Iowa corporation. It also knew, or might have ascertained, the terms of the consolidation, and whether it was within the powers of the corporation to enter into it. Having notice of these things, and being advised that large sums of money were about to be raised by the consolidated company * * * . * it is impossible to hold that it was not guilty of laches in waiting thirteen years, and until a valuable property had been built up, and large interests acquired upon the faith of the validity of the consolidation, before instituting these proceedings."

In the case at bar, it would seem that complainant, if he did not have actual notice of the consolidation of which he complains, did have notice of facts sufficient to put him on notice. More than ten years had elapsed after the first consolidation. There is no averment that there was any concealment in anything that was done. Other consolidations grew up, upon the same system, new properties were acquired, new liabilities of large amounts were incurred, the city of Birmingham, meantime, had grown with wonderful and increasing rapidity. Acts of the legislature were enacted to regulate anything that was done in the way of consolidation, of which it is difficult to conceive that complainant was not aware. He lived out of the State, it is true, but within a comparatively short distance of Birmingham. Whatever was done, appears to have been open to the public, and no actual

fraud is alleged.   It appears that complainant by his averments knew of this consolidation for some two years or more, before he commenced this suit, and, for more than ten years, he sat idly by and did nothing to repair his alleged wrong.   Every other stockholder had consented to the consolidation except himself.

The court below was of the opinion, and he decreed accordingly, that the demurrer to the bill for laches was well taken, and we approve his decree.

It is unnecessary to consider any other question discussed.

Affirmed.

McCLELLAN, C. J., DOWDELL and DENSON, J. J., concurring.